THE ALBANY AND RENSSELLAER IRON AND STEEL COMPANY *et al. vs.* THE SOUTHERN AGRICULTURAL WORKS *et al.*

| 76 | 135 |
| 116 | 693 |
| 76 | 135 |
| 117 | 637 |
| 76 | 135 |
| 118 | 667 |

[This case was argued at the last term, and the decision reserved.]

1. The most material questions respecting the legal sufficiency of the assignment, as to the omission from the schedule required by the act of 1881 of valuable assets, and as to the effect of a general clause, conveying to the assignee all property of the assignor, which for any cause was omitted from the schedule, are identical with those made in the case of *Turnipseed et al. vs. Schaefer et al.*, and to that extent are controlled by the decision therein rendered.

2. Whether or not, under the general mercantile and commercial law, an insolvent corporation is capable of making a general assignment for the benefit of creditors, either with or without giving preference and priority of payment to certain of them, yet under the provisions of the act of 1881, it may do so.

3. While in March, 1885, the general rule was that creditors without a lien could not invoke the remedial aid of a court of equity until their claims were reduced to judgment, yet special circumstances might exist rendering the rule inapplicable, and some of these circumstances exist in this case.

(*a.*) The fact of provision being made to carry on the business by the aid of goods procured for that purpose, and which have not been paid for, raises a presumption, though not a conclusive one, of an intention on the part of the parties to the transaction to delay, hinder and defraud such creditors as were not favored and preferred by the deed, and it has the appearance of an arrangement to coerce them into an advantageous settlement.

(*b.*) The complainants were not parties to the mortgages, and would have no right at law to intervene and prevent their foreclosure and enforcement; and the setting aside of the assignment would leave the creditors without remedy to enforce their rights and contest the mortgages alleged to have been made in aid of the assignment, unless equitable relief were granted.

(*c.*) An injunction should be granted and a receiver appointed.

May 1, 1886.

Debtor and Creditor. Assignments. Laws. Construction of Statutes. Injunction. Receiver. Before Judge HAMMOND. Fulton Superior Court. March Term, 1885.

On March 25, 1885, the plaintiffs in error filed their bill, on behalf of themselves and such other creditors as might become parties, alleging, in brief, as follows:

Complainants are creditors of the Southern Agricultural Works in various sums, aggregating upwards of $90,000, for debts contracted for materials and supplies used by said works to carry on its business. On March 13, 1885, the company attempted to make an assignment for the benefit of creditors to L. DeGive, giving preferences therein. The leading recitals and provisions contained in the assignment were, in brief, as follows:

It conveys all of the property, real and personal, and choses in action, more particularly described in schedule "A' thereto attached, and further recites, "and this conveyance is intended to convey any and all real estate, choses in action and personal property, the schedule attached being a full and complete inventory, so far as it is possible to make one," the conveyance being in trust for the following purposes:

Said works are indebted as follows: State and county taxes, and employés for daily wages, between $1,000 and $2,000, styled class first. Certain first mortgage bonds, about $60,000, secured by mortgage or deed of trust to L. J. Hill and P. Romare, trustees, covering the realty, buildings and machinery of said works—$36,500 being regularly issued, and about $23,500 held as collateral by creditors of the third-class. Said issue of bonds is styled herein class second.

Said works are also indebted for borrowed money, accommodation paper and discounts as follows :

| | |
|---|---:|
| Chas. Beerman, trustee | $   128 90 |
| Mrs. E. Keller | 1,300 00 |
| H. A. Kuhn | 6,611 46 |
| Garrett & Zellars | 3,000 00 |
| G. C. Beerman | 500 00 |
| Theo. Fechter | 1,500 00 |
| H. Landauer | 4,658 32 |
| Atlanta National Bank (two claims) | 2,000 00 |
| Gate City National Bank (two claims) | 12,000 00 |
| L. DeGive | 6,279 98 |
| H. G. Kuhrt (three claims) | 6,500 00 |
| E. Freylock | 2,700 00 |

H. G. Greenbaum, Cashier......... ......................... 5,000 00
Gate City National Bank (two acceptance of Land-
    auer & Co.)................................................. 2,500 00
Atlanta National Bank (one acceptances of Land-
    auer & Co. and one of Liebman & Stern)......... 1,827 60

Aggregate.......................................................$56,506 61

Notes, drafts and acceptances due to said works, discounted at said Atlanta National and Gate City National Banks. All this class is secured by two mortgages, dated March 11th, 1885, and this is styled class third. The rest of the creditors of said works, aggregating about $130,000, are next set forth and styled class fourth.

"This conveyance covers all of the property of the Southern Agricultural Works;" it is made in trust to pay debts, according to the priorities existing and hereinafter declared.

The trustee is ordered to take charge, and convert the assets into money, for the benefit of first, third and fourth classes, and the deed provides for sale of property; the second class holds bonds at long time; the sale is to be made subject to their mortgage, unless they consent, in which event the bonds are to be first paid to an amount equal to the sum realized from the property mortgaged for their security.

The trustee "is authorized to continue, for a reasonable length of time, said business. He is authorized to employ such assistance, including attorneys at law, as may be necessary for the execution of the trusts herein reposed in him, and to pay the same as part of the expenses of executing this trust."

He is authorized to sell the stock and products of the works privately, and in such quantities as may be judicious; but sales of real estate or machinery must be public.

The money derived from said assets, subject to the provision for paying the bonds, the trustee shall apply:

1st. To the payment of expenses, including his own compensation.

2d. To the payment in full of the debts of the third class, which is hereby made and declared a preferred class of indebtedness, to be paid in full before any portion of the indebtedness included in the fourth class is paid."

This preference follows, and is in addition to and independent of, the preference heretofore given this class by mortgage.

Bonds held as collateral to be cancelled when the debt they secure is paid, and such debt to be cancelled when such bonds are paid.

" 3d. He shall pay the balance realized to the creditors holding claims designated as fourth class, prorating the amount equally upon their claims, if there is not sufficient to pay them dollar for dollar."

Executed with the approval of the board of directors, signed by the president and secretary and treasurer and by the stockholders.. Accepted March 13th, 1885, by L. DeGive.

Affixed to said assignment was a schedule marked "A," purporting to be a full and complete inventory and schedule of all of the assets of said assignor, verified as such by the affidavit of E Haiman, president of said works.

The bill denied that the inventory was complete, as required by law. It further alleged that at the time of attempting said assignment, said corporation was insolvent, and being a corporation, under the laws of Georgia, its assets were a trust fund, charged equally with the payment of its debts, and that it could not prefer certain of its creditors, and that the preferences in said attempted assignment were void.

That on the 11th of March, 1885, the defendant corporation also attempted to create two mortgage liens on its property in favor of class three of its creditors, which mortgages were made as a part of the scheme of assignment, and to cover the debts until the assignment could be drawn, and were founded on no new consideration of any sort, and were made after said corporation was insolvent and

known to be such by the mortgagees, and were void. One of said mortgages covers the realty and the improvements thereon, and the other covers all the personal property, consisting of notes and accounts, machinery and tools, etc.

The bill further alleged that both said deed of assignment and mortgages were void, because they did not describe the debts, to prefer and secure which they were given, in this, that they are given to secure certain notes and drafts discounted at the Atlanta and Gate City National Banks, and the said notes and drafts are not described in any manner whatever.

That the assignment was void because there was no complete inventory and schedule attached, as required by law.

The bill charge that the inventory was incomplete in omitting entirely the following assets :

Patents worth several thousand dollars.

| | |
|---|---:|
| Interest in Southern Cotton Tie Association | $ 7,000 00 |
| Mule and dray | 250 00 |

By amendment it was charged that the following assets were omitted :

| | |
|---|---:|
| Consignment account | $ 6,113 25 |
| Deer, Mansur & Co. account | 3,491 02 |
| Also, Graham, Cousens & Co. account, (bal.) | 1,045 42 |
| Culver, Moore & Culver account | 242 46 |
| A. B. Farquhar account | 2 38 |
| Dudley Bros. & Liscombe account | 524 69 |
| M. Wolf account | 136 62 |
| Langstaff & Co. account | 800 62 |
| L. A. Gray account | 18 65 |
| Making additional omissions of | $12,375 11 |
| One buggy and harness | 70 00 |

For this reason, the assignment was alleged to be void.

The assignment is further alleged to be void for want of a sufficient schedule attached thereto at the time of its execution, in this, that it grouped articles together, without making an inventory and schedule of the same, to-wit:

| | |
|---|---:|
| "Exposition plows" | $ 400 00 |
| "Sample plows" | 100 00 |

"Odd plows" ...........................................................$　350 00
"Wood and iron for gin feeders, conductors and
　　presses"................................................................ 2,000 00

without specifying the number, kind and description thereof.

And further, because in said schedule, in attempting to make an inventory of the machinery and appliances, the description is not sufficient to show the quantity, quality or kind of each, e. g.:

"Shafting" is put at........................................... $1,285 00
"Polishing wheels"............................................　800 00
"Pulleys" ............................................................ 3,562 55
"Office fixtures, safe and stationery".................. 2,000 00

The bill alleged that the defendant corporation had been making large purchases just prior to the assignment, and was receiving the same up to the day the assignment was made, and while its inventory and schedules were being made, in order to have on hand a large lot of assets with which to break, which were bought of complainants and he other unpreferred creditors, and a great quantity of said goods are now in the hands of the assignee.

That the assignee was, up to a short time before the making of the deed, a director and stockholder in said corporation, and acquainted with its financial condition; is not an expert in the manufacturing business; is an alien, a citizen of Belgium, now consul of that country in Atlanta; is one of the pretended creditors attempted to be preferred under the assignment and pretended mortgages; he is in sympathy with the preferred creditors and antagonistic to the unpreferred creditors, refusing to show the books or give information as to the status of the business; that DeGive is managing the business under the direction of E. Haiman, the man who so disastrously run The Southern Agricultural Works; that the power given by the deed to the assignee is almost unlimited, and that, under the power to continue the business in his discretion, and employ attorneys and assistants, this trust estate will be wasted.

That the assignment was avowedly made to delay, defraud and hinder creditors. Discovery was waived.

The prayer was for judgment for the debts of complainants; the setting aside of said deed of assignment and the mortgages; the granting of an injunction and appointment of a receiver; the marshalling and equal distribution of assets among all the creditors, and general relief.

The bill was sanctioned, filed and served on March 25, 1885. DeGive was appointed temporary receiver.

On the 10th of April, 1885, complainants amended their bill as follows:

L. J. Hill and P. Romare, trustees, as hereinafter shown, and the officers and stockholders of The Southern Agricultural Works were made parties defendant.

The amendment alleged that said company was incorporated May 1st, 1882, with a capital stock of $150,000, with authority to increase the same to $500,000. The order of incorporation required, as a condition precedent to organization, that the names of all subscribers should be by them signed in a book to be kept therefor, with the amount of each subscription set opposite the name subscribing, that the subscriptions might be in "a binding and authentic form." On May 27th, 1882, a preliminary meeting was held, and thereat the following subscriptions were had:

| | |
|---|---|
| Elias Haiman | $115,000 |
| S. Landauer | 15,000 |
| C. Beerman | 5,000 |
| L. DeGive | 5,000 |
| J. Spiro | 5,000 |
| D. Keller | 5,000 |
| | $150,000 |

On May 30th, said stockholders elected said Haiman, Landauer, Beerman, DeGive and Keller directors, who elected Haiman, president, Landauer, vice-president, and J. Spiro, secretary and treasurer, and these officers, except DeGive, continued unchanged up to the time said corporation failed.

Said Haiman had previously owned and operated the works merged into this corporation, and at said meeting of May 30th, said directors agreed to receive from said Haiman his said works at the price of $150,000, and to assume all of his liabilities; to pay him $35,000 in cash and to issue to him $115,000 in stock.

On June 2d, 1882, the directors met and accepted Haiman's conveyance, and issued to him $115,000 of stock, and issued to the rest of themselves the $35,000 as above shown.    They ostensibly paid Haiman this $35,000 in cash, but in fact no money or thing of value passed, or was paid into said corporation by said stockholders on any of these subscriptions, and the whole transaction, as to the cash, was simply colorable.    The property so received was not worth over $120,000.

Haiman's liabilities were then out of all proportion to the property and business conveyed to the corporation. His debts were $102,496.17.    His "quick" assets were not over $99,000, and by this transaction these parties were simply aiding Haiman to avert an impending crisis, and said $150,000 was not *bona fide* paid up.    $29,919.97 of the assets so conveyed by Haiman were composed of his patents and the good will of his then embarrassed business. The patents were not worth over $5,000; the good will was worth nothing.    It was not such an asset as could be received in payment of a stock subscription.    The whole transaction was fraudulent; was done to relieve Haiman of his individual debts and all of the subscribers from paying in their stock subscriptions, and was calculated to mislead and deceive those with whom they should deal.

Said stockholders and directors are each liable for the $30,000 discrepancy in said stock subscription, and the same is assets of the corporation.

The result of this was that the corporation was always in straitened circumstances, and needed working capital. In December, 1883, it was compelled to bond its fixed

assets for $60,000 by mortgage of date January 1st, 1884, to said Hill and Romare, trustees.

The first year the business earned an ostensible profit of $10,562.85.

The second fiscal year, ending April 30, 1884, eleven months only, involved a loss of $4,414.78.

This reduced the ostensible profit to $5,948.07. Notwithstanding this, on June 9th, 1884, the directors declared a dividend of nine per cent on the capital stock, or $13,500, paid out as follows:

| | |
|---|---:|
| E. Haiman | $8,802 00 |
| J. Spiro | 45 00 |
| S. Landauer | 4,491 00 |
| D. Keller | 45 00 |
| L. DeGive | 45 00 |
| R. Abrams | 27 00 |

To cover this up, and prevent the books showing an impairment of capital, they carried to profit account an alleged increase in the value of realty of $8,455.23, when, in fact, because of the prevailing panic, said real estate had largely deteriorated in value, which action of said directors was a breach of trust, and rendered them each liable for the amounts received by them, and for the whole amount.

The by-laws of the corporation required the directors to meet monthly, and to exercise a general supervision of its affairs, but they failed to meet at all from 13th June, 1882, to March, 1883; from that time until June, 1883; from that time until December, 1883 (when the bond scheme was concocted); and despite the bad financial condition of said works, and the failing of strenuous efforts to sell its bonds, they met no more until June, 1884, and then to declare the fraudulent dividend aforesaid; then no more till November, 1884, when said DeGive resigned as a director, and Spiro was attempted to be elected in his stead; and then no more until 11th March, 1885, when they met for the purpose of attempting to authorize the fraudulent mortgages and assignment aforesaid.

This was an abandonment of their trust and duty, whereby the said Haiman and Landauer were enabled to overdraw their accounts, so that in June, 1884, they had overdrawn—Haiman, $9,871.77, and Landauer, $5,248.08; and although said illegal dividends were credited on said overdraft, said Haiman, Spiro, Landauer and Keller, who was also an assistant, continued to appropriate the corporation's money, until, on the 13th March, 1885, when it attempted to assign, they owed it—Haiman, $2,473.16; Landauer, $3,349.60; Spiro, $608.01; Keller, $510.51. The directors are liable for whatever cannot be collected from said parties.

The amendment further charges that DeGive knew of all this, and was present at the few meetings that were held, and participated in them. His individual interests are, therefore, antagonistic to his duty as assignee to collect said assets.

The amendment alleged that the mortgages and deed of assignment were void, because there was no legally elected or qualified board of directors to authorize them to be made, and no meeting of stockholders was held to authorize the same; that the corporation is, by its own admission, utterly insolvent as to its creditors and stockholders; and that, the said assets being a trust fund, the intervention of a court of equity is imperatively demanded by the circumstances.

After waiving discovery, the prayers asked the administration of the rights of Hill and Romare, trustees, under this bill, the collection from each of the stockholders of his unpaid stock subscription, and of the fraudulent dividend of June, 1884, received by him, and of the $30,000 discrepancy between the real value of said Haiman's property and the sum at which it was accepted for said corporation; that the directors should be held liable for the $30,000 discrepancy aforesaid, and also for so much of the said fraudulent dividend and illegal overdrafts as could not be otherwise collected.

Divers other creditors became parties to this bill, making the debts of complainants exceed $100,000.

To this bill and amendment the respondents demurred, and filed their answers as follows:

On May 2d, 1885, The Southern Agricultural Works and the mortgage creditors demurred to said bill for want of equity and for misjoinder of parties.

Said Southern Agricultural Works, also on the same day, answered the bill as follows:

It admitted the execution of the assignment, but denied that it was withheld from record or from the creditors, and alleged its execution in good faith. It denied insolvency at the time of making assignment and mortgages, and set forth its financial condition, showing a surplus of assets, including notes and accounts at face valuation of $88,-392.26 over and above liabilities, or reducing them to a cash valuation, a net surplus of $49,647.16.

It averred that if it, or its assignee, should be let alone, the stock on hand could be sold at a profit, thus swelling the assets.

This estimate does not embrace the patents.

It denied that the mortgagees knew of its insolvency at the time the mortgages were made, and alleged that they were made to secure borrowed money and endorsers.

It asserted the right of manufacturing corporations to prefer their creditors. It denied that the mortgages and assignment failed to describe the debts they secured, and if they did as to some, this did not affect those described.

That it tried to make out a complete schedule of assets, and for fear of omission, inserted a clause in the assignment providing that all of its assets were thereby transferred to its assignee, and submits that, if any were left out of the schedule, it was by clerical omission, and does not affect the validity of the assignment.

The patents, consignment account and Deer, Mansur & Co. account were left out by the book-keeper's error, and

were reported to the assignee by the respondent before the bill was filed.

Respondent did not own the accounts of Graham, Cousens & Co., Culver, Moore & Culver, Dudley Bros. & Liscombe, nor Langstaff & Co., all of which had been transferred to Mr. Hoke Smith in payment of fees.

It denied owning any interest in the Southern Cotton Tie Association.

It thought the mule, dray and buggy were mentioned in the schedule; they were turned over to assignee with the rest of the assets.

It denied having made large purchases of supplies in excess of its needs and capacity, or with any other expectation than of paying in full therefor; and it denied purchasing a heavy stock with which to prefer creditors. It showed that in the season of 1882–3, it purchased $155,-623.00; in the season of 1883–4, $135,012.00, and in the season of 1884–5, $148,191.00. The purchases for the balance of the season of 1884–5 had been practically made.

The trade in September, October and November, 1884, was light; December improved; January was the largest respondent ever sold. This induced heavy purchases. February trade fell below any similar month, rendering respondent unable to meet its bills.

It admitted that it received goods up to the time the assignment was executed, but claims it notified its creditors as soon as this was done, that they might stop goods *in transitu*.

After respondent had realized the impossibility of continuing its business, it selected DeGive as assignee, because of his fitness and the leisure he had to give to the business. It denied declining to show books and assignment or give information.

It denied making mortgages or assignment to hinder, delay or defraud creditors.

It denied that the power to continue business given to the assignee would result in waste, and claimed that the

complainant approved of this provision, and that the present charge is a subterfuge.

It denied that DeGive was managing the business under Haiman, and stated that he preferred to do so under the advice of creditors. It admitted the charges in the amended bill as to the time and manner of incorporation, and the amounts of subscription to stock, Haiman's previous ownership of the property merged into the corporation, and the sale to the corporation, the valuation put thereon, the election of officers, and that no money actually passed to Haiman from the corporation. It alleged that Haiman, in 1876, began the plow business in Atlanta, and from that time up to the end of the fiscal year ending 30th May, 1882, made profits aggregating over $150,000.00. At this time, he greatly enlarged and improved his plant "by the erection of buildings and the purchase of machinery," the expense of which exceeded his expectations, leaving him without sufficient capital to utilize his business to its fullest extent. " Thereupon he conceived the idea of organizing a corporation with a stock first equal to the net value of his assets, but with the privilege of increasing the stock, his plan being to pay for the first stock with his assets, but to distribute a portion of it around among suitable persons who, when convinced of the merit of the enterprise, would join him in disposing of additional stock, the money to be derived from the sale of this additional stock to be used for the purpose of filling the buildings with machinery to their full capacity, and for the purpose of providing a cash capital with which to operate the buildings and machinery to their fullest extent. He selected a number of gentlemen of standing in the community, such as Jno. Fitten, Donald Bain, Chas. Beermann, L. DeGive and others, but Chas. Beermann and L. DeGive alone subscribed for stock, of the number mentioned."

" Haiman gave the company credit for the $35,000.00 due him, requiring the company at the same time to give S. Landauer, C. Beermann, L. DeGive, J. Spiro and D. Kel-

ler, credit for their subscription for stock. E. Haiman settled with said stockholders for said stock."

It denied that these parties were aiding to avert an impending crisis. The assets were delivered in good faith, and were worth, above the liabilities, $150,000.00. No crisis was impending, and business was profitable. The assets conveyed by Haiman amounted to $252,496.17. (These are itemized in the answer.) The realty and buildings were placed in this statement at $77,500.00, but were worth much more, and other assets were put in at less than their cost.

It denied that the patents were worth only $5,000.00, and that the good will could not be received for the stock subscription; that it alone was worth $30,000.00. The patents, estimated from profits derived by Haiman from their use, were worth $35,000.00.

It denied the liability of the stockholders and directors for any alleged discrepancy in the value of the property received.

It denied that the profit on hand 30th April, 1884, was reduced by 9th June, 1884, but alleged it was increased from $1,500.00 to $2,000.00. It admitted the dividend of June 9th, 1884, but denied that the carrying of increase in value of realty was done to cover shortage and prevent the books showing an impairment. This was done 30th April, 1884. It denied any deterioration in the value of realty at that time, but averred an increase justifying the above. No money was drawn on the dividend from the corporation, but the same was applied as a credit on the accounts of Haiman and Landauer, which were overdrawn. These overdrafts were created by their salaries being too small for them to live on, and by their gratuitous assumption of certain accounts to the corporation, for sales by Haiman, which had proved uncollectible, and by the assumption of $1,130.00 commissions for negotiating the company's bonds. Another item in the overdraft is this: On the 22d September, 1884, " Haiman and Landauer negotiated the purchase

of certain mines in Mexico for certain parties here in Atlanta. (Haiman and Landauer were interested in said purchase to the amount just mentioned,—Haiman $476.00, Landauer $272.00.) The parties here purchasing paid cash for their interest; but as respondent needed money, Haiman and Landauer arranged to give the note of respondent to the seller of the Mexican property and to use the money of the purchasers in the business of respondent."

The note is out for this, but the consideration has failed, and respondent is relieved, therefore, from paying its note, and Haiman and Landauer from paying this overdraft

It admitted regular meetings of directors were not held, but alleged that a majority of the directors were constantly in consultation with Haiman and Landauer as to respondent's affairs.

As to the indebtedness of Spiro and Keller to respondent, the facts are that respondent owed them and transferred to them an account owed to it in payment, which was in excess of the amount it owed them. This excess was charged, and constituted the indebtedness. Since the assignment, they have paid off said indebtedness to respondent's assignee.

It denied that it had failed to attach a complete inventory and schedule to the assignment, and alleged that the charge of complainants, that it grouped articles under general heads, proceeded from ignorance of the meaning of technical terms:

"Exposition Plows" meant plows made for Louisville Exposition, and kept for display at expositions. They were kept separately, and known as such by respondent's employés.

"Sample Plows" were collections of various kinds for comparison, and were kept separately, and known to respondent's employés and the trade as such.

"Odd Plows" are remainder of a job lot, names and sizes obliterated, were knocked down, and could not be other-

wise designated, and are known as odd plows by respondent's employés.

The wood and iron patterns for gin feeders, conductors and presses is a perfect designation of a set of patterns, entirely understood by the trade.

A schedule of machinery and appliances is unnecessary, as they are fixtures, and a part of the realty; none of them are merchandise, stock or articles for which respondent owes, and they are paid for.

It is asserted that on 11th March, 1885, there was a duly constituted board of directors who authorized the mortgages and deed of assignment, and the same were approved by all the stockholders.

It denied that Wolffe owed $136.62 at the time of assignment; he owed then $46.66 less than that, and since the assignment has paid $32.71, leaving only $57.25 due at the time of answer.

A. B. Farquhar's is a disputed account, and is really not due to respondent.

Respondent showed that, so far as its officers know, every item of assets accidentally omitted from the schedule has been mentioned by complainants, and no accounts or assets have been transferred to any person other than those already named, except an account of $699.14, transferred to W. & A. R. R. to pay freight.

The answer was sworn to by E. Haiman.

DeGive demurred to the bill on the following grounds:

(1.) No equity in the bill as against him.

(2.) Misjoinder of subject-matters. The bill joins setting aside of assignment, collection of stock subscription, and recovery of illegal dividends, and of sums claimed by reason of his neglect as director.

(3.) Misjoinder of parties.

(4.) Because the bill does not allege that complainants extended credit on the faith that defendant was a stockholder or director in said company.

(5.) Because the creditors cannot inquire into the ques-

tion of the manner and status of defendant's stock sub-scription unless they extended credit on the faith thereof.

DeGive filed an answer as assignee and one as an individual, alleging, in brief, as follows:

On 9th March last, Haiman called on him touching the assigneeship; explained that the company was sued on a contested claim, which had set rumors afloat which might alarm creditors and cause action affecting and destroying the business; that it could be saved, if it could be administered without expensive litigation; that with the credit of the company impaired by said suit and rumors, it would be impossible to continue the business; that the company was solvent, and if prudently managed would pay out; and requested defendant to act as assignee. "This defendant at once comprehended the whole situation. He wished to save from destruction one of the finest industries in the south, if possible. He wished also to save, by judicious and wise management, some remnant of the property of the company, after the payment of all its debts, for the stockholders." He realized that through his standing with the banks of the city of Atlanta, who held $23,500 of the company's bonds, he could delay precipitate action on their part, and could control other creditors residing in the city, and was confident that, with the help of the book-keeper and other employès, he could conduct the business. On March 13th, 1885, he took possession of all the assets of the company of every sort, and has remained in possession ever since.

On the first day of his administration, the book-keeper notified him that the debts of Deer, Mansur & Co. and L. A. Gray "were not specifically described in the schedule," though on the books of the company. Defendant has since collected the latter. "On the third day of his administration, Mr. Haiman, the president of the company, called his attention to the fact that he was in possession, as assignee, of one mule and dray, one buggy and harness, and of one bundle of patents in the drawer of the safe, because

these items were not specifically described in the schedule." About the same time, Haiman notified him of the consignment account. Defendant has been using this property and the patents, and collecting on the accounts. Defendant has been running the business as assignee and receiver. From March 13th to April 20th, he has sold $24,513.69 of goods, "and yet the stock assigned to this defendant is so large that, to the casual observer, it does not see that it is diminished." Defendant denied knowledge of the condition of the company, or of large purchases by it before the assignment, but believed the business prosperous. He denied that he refused to show the books; stated that he instructed the book-keeper to refer all inquiries to his attorney, Henry Jackson. Since his receivership, he has shown the books to all inquirers; before that, he referred them to his counsel, but don't remember that any inquiry was made. He denied that he was acting under Haiman's advice or direction.

While he has had no large experience as a manufacturer of iron, "that a long experience in successful business-life enables him to satisfactorily discharge all the duties incumbent upon him." He admitted that he was a foreigner and the Belgian consul at Atlanta, Georgia. The assignment was withheld from record until the 7th day after its execution, under the advice of defendant's counsel, with whom it was left, and said attorney was to show said paper, except the list of creditors and debtors, to attorneys representing creditors; said attorney stated he would use discretion as to exhibiting the same, so as to prevent precipitate action until the largest creditors could examine for themselves, and denies that he withheld it for any other purpose. He denies that the company was insolvent when it assigned, and asserts it is solvent and will pay dollar for dollar, if properly managed; asserts the right of a corporation, under the laws of Georgia, to prefer, and says that, subject to the preferences made, the assets are a trust fund to pay debts. Admits that the mortgages were made to

preferred creditors. Denies that the mortgages and assignment are void, as not describing debts preferred. Denies that the schedule was incomplete. Sets up that it is impossible to describe assets minutely in an assignment of this sort. Denies that the company owned any interest in the Southern Cotton Tie Works. Mule and dray were turned over to the assignee under the deed, and are in his possession. He denies that the works had been " stocking up " preparatory to assigning and preferring favorite creditors, and denies knowledge of purchases. He ceased to be a stockholder or director on November 10th, 1884. Since then had not been at the works or consulted the officers until just before assignment, and knew nothing of its financial condition. It is true defendant is not an expert in manufacturing iron, is a creditor by mortgage, and desires the preferred creditors paid, but denies that he refuses to show the books and assignment, or to give information to creditors. Says he is honest, has large business experience, and can carry on the business with assistance and proper employés. He has the confidence of all the moneyed institutions of this community, and of the people thereof, and thus situated, can certainly make the assets yield as much as, if not more than, any other person. Has resided in Atlanta twenty-five years. He is solvent, and much interested, under the charges in the bill, in making the assets pay the debts. Denies that mortgages or assignment were made in bad faith, or to hinder and delay creditors. Denies that the business was run at a loss for three or four months prior to assignment, but asserts it was run at a fair profit. This defendant is unable to perceive how the appointment of a receiver will prevent bills of costs and fees, and says same is a most expensive way of winding up estates. He admits that his subscription to the stock of The Southern Agricultural Works was substantially as stated by complainants, except that he gave his check on a solvent bank to the secretary and treasurer in payment thereof, who handed it to Haiman in part pay-

ment of the $35,000 due him. Defendant " was abundantly able to make said check good, had he been called upon to do so." Haiman accepted same in payment, and afterwards returned the same to defendant, the facts being as follows : Haiman had come to Atlanta and organized the plow business ; by reason of enlargement of his plant, and an under-estimate of its cost, he found himself obliged to raise and invest more money, in order to utilize the same. Under the advice of friends, he determined to follow the usual plan and turn his works into a stock company, and by sale of stock raise the money. He sold his business and works to the company for its original stock as charged. Defendant says they were worth fully $150,000 ; that patents and good will were valuable, and were assessed too low. Haiman came to defendant and asked him to take stock in the company ; he was impressed with the enterprise, but by reason of other investments unable to do much. Haiman offered to " carry him" for any stock he would take until he (DeGive) should determine whether or not he would invest permanently therein. Under these circumstances, he subscribed $5,000, gave his check as aforesaid, and the same was returned to him by Haiman, as aforesaid, under this arrangement. Defendant thinks Mr. Beermann subscribed in the same way. The other subscribers were the parties who expected to actively run the business and owned it all.

Landauer is Haiman's brother-in-law, Keller his nephew, and Spiro is Landauer's nephew. Within thirty days, he transferred to Haiman $4,000 of this stock, leaving the defendant the owner of $1,000. Denies entering into any combination with Haiman, or any one else, to relieve Haiman from paying debts, or to relieve himself, Haiman or other subscribers from paying for stock, or to avert a crisis. He denies all liability as stockholder or director on any account, and denies under-value of property turned in by Haiman, or the receipt by defendant of any dividend. The depression in the iron business began about the time the

company was organized, " and from that time until the present has continued, reaching its lowest point shortly previous to the assignment." He admits that the company did not have sufficient cash to carry on the business, and therefore bonded itself for $60,000. " The small amount of surplus capital in the city of Atlanta had a material influence in preventing the sale of stock here," but it was thought that an 8 per cent. bond could be disposed of elsewhere. " But the company failed even in this, and could only negotiate them to the amount of $36,500. It would thus seem that defendant's name, as a stockholder and director, had proved utterly useless to the company in enabling it either to sell its stock or its bonds." In April, 1884, $4,040.45 was added to the surplus fund for increase of realty " and other profits," without reference to a contemplated dividend. On June 9th, 1884, a nine per cent. dividend was declared. Haiman and Landauer had overdrawn their accounts respectively $9,871.77 and $5,248.08. This should not have been done. This defendant protested and voted against the dividend, but it was claimed that they had large families and salaries were too low. They had no resources outside of business, and insisted the surplus justified it, and that it was best to declare a dividend, which would be paid by crediting their accounts. Defendant never received the dividend so declared. Only $117 was paid in money. It is true, defendant did not attend monthly meetings of board, but a majority thereof, owning nearly all the stock, were practically in daily session, and with the exception of these overdrafts and dividends, did nothing defendant disapproves. He denies liability for this course of conduct on his or said officers' part. under the allegations of the bill.

On December 29th, 1881, respondent loaned Haiman $5,000, and took his note at 8 per cent interest, and never called for principal or interest till a few days before the making of the assignment. He had perfect confidence in the company's solvency. Respondent alleges that he is the

most suitable person to make the assets available; that if continued in charge of the trust, his other business arrangements are such as to enable him to give his undivided attention and time to the discharge of the duties devolving upon him.

" And having thus fully answered, this defendant submits the issues made, with perfect confidence, to the decision of the court."

Charles Beermann answered the bill, alleging, in brief, as follows:

In 1882, he learned from Haiman of the contemplated corporation that was to be organized on the basis of the net value of said Haiman's assets, " with the privilege of an increase, after said organization, by the sale of stock to outsiders, the plan being to sell to outsiders to such an extent" as was necessary to raise enough money to utilize Haiman's plant.   He agreed to aid in the organization, and to that end subscribed $5,000 to the stock.   Respondent believes Haiman's property was worth, net, the $150,000 at which it was received.   Haiman agreed to " carry" respondent for his subscription until he could settle for it.   He at once paid him a part of the amount, and afterwards sold him the balance of said stock.   He acted in good faith.   Haiman and Landauer's salaries were fixed at much less than they were worth.   The increase in the value of realty, carried to the surplus account in April, 1884, defendant knew nothing of until in June, 1884; but it was done *bona fide*, and not in contemplation of a dividend.   He never doubted the solvency of the company.   On June 9th, 1884, the dividend was declared, instead of increasing salaries of Haiman and Landauer.   These salaries were too small.   These parties, otherwise frugal, were lavish with their immediate relatives, and defendant yielded to declaration of the dividend, believing they would be more frugal in spending dividends than salaries.   Defendant did not hope for any early increase of capital by sale of stock, and was anxious to increase by saving profits.   He drew no part of said dividend.

Denies abandoning business to Haiman and associates.. States institution of suit and crippling thereby of credit, as answered by The Southern Agricultural Works, and it was deemed necessary to assign. DeGiye was selected because of his integrity, capacity and leisure. Denies all allegations of bill charging fraud, misconduct or negligence, and says the assets of the company are worth more than its liabilities.

Haiman, Landauer, Spiro and Keller answered the bill, in brief, as follows:

On May 2d, 1885, these defendants, having demurred on the same grounds as said defendant company, answered the bill. They adopted the answer of The Southern Agricultural Works. They denied fraudulent or negligent conduct. The assets received from Haiman were worth $150,-000 net. When the dividend was declared, it had been earned. For a long time defendants had been overtaxed, because capital was not sufficient to carry on business. Just prior to assignment, a suit against the company was filed, with the result stated in the company's answer, and they felt unable, under this pressure, to go on, and the assignment was made as the best thing for creditors and all concerned. They deny that the company is insolvent.

H. G. Kuhrt and other preferred creditors answered the bill, in brief, as follows:

The amounts stated in assignment are justly due them for money loaned, accommodation endorsement and paper discounted, as therein specified. These claims are valid, and the mortgages were taken without notice of insolvency of The Southern Agricultural Works. They believed works solvent when money was loaned, etc., but it was then understood they should have mortgages whenever they desired.

L. J. Hill, trustee, answered the bill, in brief, as follows:

He and Romare are trustees of the bond-holders of The Southern Agricultural Works, under a mortgage covering its realty, machinery, etc. They have no interest in the

issues here presented, except where they may affect said mortgage, and as to such, they ask the court's protection and to be heard.

"They do not regard themselves as proper parties to this litigation, but understand that they are brought before the court as interested spectators of the great battle between the secured and unsecured."

Thinks assignment should stand. "The assignee is a gentleman of fine business capacity, of the highest integrity, and in every way qualified to exercise faithfully and impartially the trust."

(This answer is signed only by counsel, and is not verified.)

The testimony introduced on the hearing was, in substance, as follows:

The assignment, exhibits and mortgages were introduced·

The affidavits introduced by complainants showed, in brief, the following facts: The claims of complainants were proved. They sold to The Southern Agricultural Works on the faith of reports of mercantile agencies, showing its solvency, and on the belief that it was solvent. Two of them stated that they were influenced in selling by statements of the president,—one in May, 1884, showing a surplus of assets over liabilities of $175,000, the other about September, 1884, showing works $150,000, stock $80,000, accounts $35,000, debts $95,000, of which $36,500 were bonds secured on works and due at long time. One of these stated that Landauer, the vice-president, also stated that the works were in a prosperous condition in May, 1884, and making money. The purchases made were in excess of the needs of the company, and they were not prepared with machinery to manufacture some of them. One witness stated that he found that they over-bought to defraud creditors. A considerable amount of goods was shipped in February, and the bulk of the personalty was bought within sixty days before the assignment, when the company must have known that it was insolvent; and

some of complainants' goods were received at a time when it must have contemplated making the mortgages of March 11, 1885, shipments being made between the last of January and the 20th of February. There was delivered to the company from the Western and Atlantic Railroad, on March 9, 1885, one car-load of slab steel, and on March 10, one car-load of bolts and one car-load of whiffletrees and bolts. Three witnesses stated that Haiman, the president of the company, told them that he made the assignment to avoid paying a note of $2,300 on which the company was sued; and a fourth stated that Haiman told him that this was one of the reasons for assigning. Several witnesses stated that a proposition for settlement was formulated on behalf of the unsecured creditors, looking to De-Give's displacement, but Haiman declined to accede to any proposition which would take the business from his (Haiman's) control and management, and said he would never consent to any receiver being appointed who would not let him manage the company, and that he did not mean to be deprived of control of its affairs. One witness testified that Haiman said that if they did exclude him, he would start a rival business. He admitted that the values attached to the manufactured articles in the assignment were at selling prices, and did not deny that prices affixed to materials therein exceeded their cost. Several applications were made to DeGive to see the company's books and papers, but were refused, as well as any information, without consulting his attorney. One witness so stated; another said that DeGive refused to allow him to see the books; a third said that he applied to Haiman, who referred him to DeGive, who referred him to his attorney, and the latter said he did not have the books, and witness could not get the books until a receiver was appointed, and under order of the court. One witness, a representative of one of the complainants, admitted that he had said that the business could only be wound up by a disinterested receiver; and another admitted that he had said that

the business ought to be run, so as to use up material on hand; but both denied acquiescing in the control by De-Give. A witness, who examined the books of the company, stated that they showed the following, among other facts:

A comparison of the ledger accounts receivable with the schedule filed in the office of the clerk of the superior court with the deed of assignment, shows that the following items have been omitted therefrom, representing amounts due the company:

| | | |
|---|---:|---:|
| Live and carriage stock...........................$ | 320 00 | |
| M. Wolff................................................. | 136 00 | |
| Deer, Mansur & Co., St. Louis...................... | 3,491 02 | |
| Graham, Cousens & Co., Memphis, ledger balance $1,596.79, amount stated $551.35, Deficiency........................................... | 1,045 42 | |
| Culver, Moore & Culver, Macon................... | 242 46 | |
| A. B. Farquhar & Co., Macon...................... | 2 38 | |
| Dudley Bros. & Liscombe, Nashville.. ......... | 524 69 | |
| Langstaff & Co., Memphis........................... | 800 62 | |
| L. A. Gray................................................ | 18 65 | $ 6,581 86 |
| Goods out on consignment, not enumerated in the inventory.............................:.... | | 6,113 25 |
| Total .............................................. | | $12,695 11 |

This witness then detailed the history of the organization, division of stock, declaration of dividends, profits and losses, etc., substantially as set out in the amendment to the bill.

Another witness, who stated that he was an expert bookkeeper, testified that the stock ledger and stock certificate books showed as follows: 1,500 shares issued 5th June, 1882, and that 15 days later, 80 of the 100 shares issued to Beerman and DeGive were surrendered to Haiman, leaving each with 10 shares. Beermann surrendered his remaining 10 shares to Haiman 26th May, 1884, and DeGive surrendered his remaining 10 shares to Beermann 10th October, 1884, though the stock was not transferred on the books then; Spiro transferred all of his stock but five shares to

Haiman, 9th April, 1884, and owned only five shares when elected a director, in November, 1884. Haiman re-transferred 10 shares to Spiro 10th March, 1885.

In round numbers, the purchases of merchandise were as follows: In 1882–3, $174,500; in 1883–4, $156,000; in 1884–5 (to March 12), $179,000. Purchases for four months preceding failure largely exceeded those in corresponding months in previous years, while sales were less. Valuation put on machinery at time of organization was $39,462.25; on March 12, 1885, it was $53,544.29. No allowances were credited for wear and tear, though charges were made for work done and material furnished for old and new machinery. Numerous articles in inventory are scheduled at prices without regular discount to trade off. If this were done, it would reduce prices in inventory about $20,000. All material worked up and ready for market, is inventoried at selling prices.

A number of affidavits as to value of the assets were introduced by complainants. The witnesses estimated the realty, including the buildings, at from $37,500 to $45,000; and two witnesses stated that the machinery would not sell for more than fifty per cent. of cost prices. The land was assessed for city taxes in 1884–5 at $15,000, and the whole taxable property was returned for state and county taxation at $60,000. Such property had depreciated by reason of the financial crisis and the failure of similar enterprises in Atlanta.

The affidavits on behalf of the defendants showed, in brief, as follows: It is not true that the company bought more than it had capacity to manufacture. The company delayed purchasing in 1884–5 because of unsettled market. The entire purchase of steel in 1884–5 was less than for previous seasons, and owing to its not coming in promptly, the company could not fill a considerable number of orders. The comparative statement of sales and purchases for corresponding months of 1882–3–4 is not correct. The purchases for 1882–3 were

$149,203.19; in 1883–4, $148,844.74; in 1884–5, $143,-720.68.    The purchases in November and December, 1883, and January and February, 1884, were less than those in corresponding months in 1884–5, because of heavy purchases which were made in the spring and summer of 1883, and because stock was less at beginning of season of 1884-5 than in preceding years.    The assignment was not made to avoid the suit against the company.    Landauer testified that he told Bailey (a witness for complainants), and showed him by items, that merchandise in assignment schedule was estimated with discount off, plus freight, and manufactured goods at cost, with freight and labor added, and not at selling prices; that dividends were not paid according to stock held, but as stockholders wanted them paid; $1,500 worth of goods were stopped *in transitu* by one of complainants, and the company owes that much less than the account sued on.    The assignment was not made to hinder or delay creditors; and the suit against the company did not cause the assignment, except as it may have affected the credit of the company.    Spiro, the secretary and treasurer, denied that the assignee refused Caldwell (a witness for complainants) access to the books, but referred him to his (the assignee's) attorney; also stated that D. Keller owned more than ten shares of stock when elected director; that the machinery account shows only cost and additions to machinery, and $3,917.40 expended upon same has not been entered upon said account; that he failed to show Bailey annual statements, because he could not find them; that the merchandise account does not show all merchandise, because not balanced at time of assignment; that up to a few days before assignment, corporation could have bought unlimited stock convertible into cash; that it frequently cancelled accepted orders, and declined solicited ones; and that malleables must be ordered some two months before they are received; also that the resolution authorizing the making of mortgages and assignment was unanimously passed, and that he, Beermann and Keller acted as direct-

ors with the full knowledge of the stockholders; and all of the stockholders, within twenty-four hours after the execution of the mortgages and assignment, ratified them. The day after the assignment, the assignee employed Henry Jackson, Esq., as his attorney. Mr. Jackson advised that the assignment be left with him, and that all inquiries as to it or the books be referred to him, and that the deed be not recorded until the arrival of the larger creditors, as attorneys might garnish debts in other states and persons might, by colored statements to creditors, precipitate litigation.

In the affidavit of Mr. Jackson occur the following statements:

"Deponent stated he would exhibit to attorneys representing creditors the assignment, except the list of creditors and debtors, and would present the entire paper to the creditors when they arrived." Also that he gave the assignment freely to creditors for inspection, and furnish them with a private office; that he offered to have Haiman and his attorney and DeGive meet them; that the deponent does not recollect that any creditor, or representative of a creditor, asked him to let them see the books; that the books were not at his office; but had he been requested, he would have permitted the inspection of them.

Haiman made affidavit, in brief, as follows:

The letter to Ridgely (referred to in affidavits for complainants) was written six weeks after deponent left home, and did not pretend to be accurate. He denies that the purchases were made in bad faith, or in order to fail. He denies that they lacked machinery to cut slab steel into different shapes. He denies that he declined to have a receiver appointed because he wanted to control the business, but says he did so because he thought the creditors' proposition unfair, and he had no right to consent to the appointment of a receiver. The creditors told him that, if he did not give security to pay 100 cents on the dollar, or pay 75 cents cash, they would litigate regardless of consequences;

that assets ought to pay 100 cents easily.   This took place in presence of Messrs. Bailey, Schuyler and others representing more than one-half of complainants.   Deponent sought to give complainants all information, and they have distorted his statements; he denies that he ever said assignment was made to defeat claim of the Silver Mining Company.   Did say that it had been partly the immediate cause thereof.   Knows nothing of statements made to R. G. Dun, or any one else, and they are inaccurate. Also that on March 13, 1885, he sent a circular to the creditors, informing them of the assignment and its terms; that the footings in the schedule attached to the assignment are with discounts off; that he handed Bailey (representing one of complainants) a circular and told him that merchandise and materials footed up about $120,000 ; that all of the directors were present at the meeting of March 11, and voted unanimously for the mortgages and assignment; and that they owned all the stock.

The book-keeper made affidavit that on the books entries were made showing assignment to DeGive at 9 A. M. on March 13, 1885, and other entries were continued under him as assignee, and the assignee had managed the business ever since; that the amount of purchases cannot be made up, as done by the witness for the complainants, and the amounts stated by him were not correct; that he, as book-keeper, took off the amounts from ledger for the schedule of assignment; that an account of Deer, Mansur & Co., of St. Louis, Mo., $3,491.02, L. A. Gray, Waynesboro, Georgia, $18.65, were omitted by error, and not intentionally, and he had received no instructions as to putting in or leaving out said accounts.   The consignment account, $6,113.25, was left out of schedule, as same was usually, and should have been included in inventory of stock.   It was for machinery on consignment, and he thought those attending to the taking up of the inventory of stock would include said account.

DeGive made affidavit that as assignee and temporary

receiver, he had to order divers goods stopped *in transitu* by sellers to Southern Agricultural Works in order to carry on business; that in regard to the language testified to by Mr. Caldwell in his affidavit, as used by deponent, as to his being appointed receiver, it isolates and thus misrepresents it.

Other affidavits went to show that for two or three days before the recording of the assignment, creditors had access to it and had copies of all except the lists of creditors and assets; that five or six days after the execution of the assignment, they paid a copyist to make copies of the list of third and fourth classes of creditors, and expressed themselves satisfied; and that during the time the assignment was being recorded, every facility was afforded for its examination.

A number of affidavits were introduced by defendants on the subject of values of the property. They estimated the real estate as worth from $80 to $100 per front foot, the frontage being 513½ feet, or, in bulk estimate, the land was valued at from $40,000 to $50,000; the buildings at from $50,000 to $64,060.75; and the machinery at from $52,000 to $61,809.50.

Upon the hearing, on the 23d May, 1885, the chancellor refused the injunction and receiver prayed for, but restrained DeGive, assignee, from paying out the money or disposing of the property until his judgment might be reviewed by the Supreme Court. Complainants excepted.

ABBOTT & SMITH; CANDLER, THOMSON & CANDLER; MYNATT & HOWELL; HARRISON & PEEPLES : KING & SPALDING, for plaintiffs in error, cited as follows: If patents and good will were not worth value placed on them in paying for stock, subscribers owe that sum, and it is omitted assets: Mor. Corps., §§575, 589; 19 Cent. L. J., 465.

Full and complete schedules required: Code, §§1953(d) and (e); Acts 1880–1, p. 174; 70 *Ga.*, 293; *Coggins vs. Stephens & Co.*, 73 *Id.*, 414.

Rights of creditors favored: *Oliver & Co. et al. vs. Victor & Co. et al.,* 74 *Ga.,* 543; 70 *Ga.,* 293; 71 *Ga.,* 815.

Act strictly construed, party claiming under, must come within letter: *Knoxville Iron Works vs. Wilkins. Post & Co.,* 74 *Ga.,* 493; and *Scott vs. Jones, Ib.,* 672; 71 *Ga.,* 678.

General words insufficient: Code, §1953(d).

If insolvent, object was to defeat particular debt: Code, §1952.

If solvent, assignment *ipso facto* a delay and hindrance and fraud: 4 Minn., 204; 3 Barb. Ch., 644; 40 N. H., 237, 246; 1 San. Ch., 4, 9; 7 Jones L. (N. C.), 313; 21 Kans., 73; 95 Ill., 298; 10 Mo. App., 7.

Continue business, provision to, avoids: 49 Conn., 282, 325; 95 Ill., 298, 308: 52 Md., 211.

Sacrifice to stockholder, assignment to prevent, is fraud, 3 Mon. (Ky.), 1, 4; 7 Pick., 74.

Fraud proved by slight circumstances, Code, §2751; 67 *Ga.,* 500.

Corporation cannot stop business and assign with preferences; creditors have equitable lien: 40 *Ga.,* 102; 18 *Id.,* 86; Wood's Field on Corps., §§132, 154, 129, 365 and notes; Story Eq. Jur., §1252(a.); Mor. Corps., §§559, 563 and note 4; 571–2–4–9, 585, 381, 581–2; 7 Wall., 392; 17 Id., 610; 91 U. S., 60; 103 U. S., 508; Taylor on Corp., §§654–5–6, 44; Thompson Liability of Stockholders, §10; 65 *Ga.,* 649; 4 Cold. (Tenn.), 471; 8 *Ga.,* 486, 493; Taylor Corp., 668, 753; 43 N. H., 263; 1 Sm. & Mar. (Ch.), 207, 258–264; 9 Lea (Tenn.), 713; 66 *Ga.,* 615; Code, §§1688, 1675 (5); Hotchkiss Dig., p. 370, §116; Code, §1939. Contrast, 6 Conn., 232; 6 Gill & J., 205; 5 Watts & S., 373; 40 *Ga.,* 391; 70 *Id.,* 501.

Receiver necessary, whether insolvent or not; trust fund in danger: Code, §§274, 3098, 3149, 3195; 10 *Ga.,* 274, (h. n. 9, 10); High on Rec., p. 195; 54 Eng. Ch., 911; 70 *Ga.,* 661, 665; 11 *Ga.,* 570; 2 Woods, 409, 414; Mor.

Corps., §§572, 585; Taylor Corp., §658; Kerr on Rec., pp. 19, 26; 70 *Ga.*, 313.

Equity jurisdiction, though no judgment lien: 42 *Ga.*, 46; 58 *Id.*, 50.

Insolvent, the company is: Code, §1953(a).

Value defined: 17 Wend., 399; 3 N. H., 359.

Insolvency, what is: 2 Bouv. Inst., p. 151; 4 Hill, 650; 9 N. Y., 594; 3 Gray, 594, 600; 3 Allen, 114; 4 Cush., 127; 8 Iowa, 239; 2 Woods, 23; 16 Wall., 599; 3 Cal., 620; 2 Young & J., 459; 1 Maule & Sel., 338, 350.

HOKE & BURTON SMITH; JACKSON & KING, for defendants, cited as follows:

Not insolvent and not within act of 1881: Acts 1880–1, p. 124; 68 *Ga.*, 530.

No lien or title, creditor cannot file bill: 56 *Ga.*, 139, 145, 428, 611; 42 *Id.*, 124, 46, 58 *Id.*, 50, 69 *Id.*, 665, 670; 55 *Id.*, 639; 60 *Id.*, 11; 64 *Id.*, 359; Bish. Insol. D., §§114, 289; Burr. Ass., 336; 47 *Ga.*, 530; 50 *Id.*, 370.

Corporations may assign with preferences: Angell & A. Corp., §191 and notes; Mor. Corp., §582 and notes (Contrast, Taylor Corp., §668); 6 Am. & Eng. Corp. Cas., 298 and note; Code, §1952; 37 *Ga.*, 612, 618; Code, 1861, §§1953, 1954, par. 1; Acts 1865–6, p. 29; Code, §5; 8 *Ga.*, 506; 37 *Id.*, 614; 40 *Id.*, 402, 1 Sm. & M. Ch. (Miss.), 207 (Compare 7 How., 276; 4 Cold. (Tenn.), 471; 43 N. H., 263); Green's B's. Ult. Vir., 123; 1 Jones Mtges., 124; Burr. Ass., §64; 6 Conn., 233, 342; 6 Gill & J., 205; 26 Am. Dec., 256; 13 Ark., 563; 5 Watts & S., 223; 3 Bab. Ch., 119; 20 Vt., 444; 2 Stew. (Ala.), 410; 4 Hump. (Tenn.), 403; 13 Met., 497; 9 S. & M., 430 (17 Miss., 394).

Omission of patents, etc., from schedule not invalidate: 9 Met., 339; 2 Pick, 472; 4 Mason, 218; Bish. Ins. D., 289; 85 N. Y., 464.

Hinder and delay creditors, this assignment does not: 23 Fed. Rep., 425; 22 Pick., 474; 4 Mason, 210; 68 *Ga.*,

531, 532; 98 U. S., 509, 510; 37 *Ga*, 612; 45 *Id.*, 204; 47 *Id.*, 82.

Legal remedy adequate, if assignee unfaithful: Code §9953; 31 Am. R, 319 (38 Mich., 363); *Old Hickory, etc., Co. et al. vs. Bleyer et al.*, 74 *Ga.* 201.

Receiver, no necessity for: 59 *Ga.*, 270; 67 *Id.*, 52.

DeGive holds either as assignee or as trustee or agent, 66 *Ga.*, 67; Bump. Fraud. Conv., 334.

Solvency not prevent assignment: Burr. Ass., pp. 79, 83; Bump. Fraud. Conv., 330, 369, 371, 372; 21 N. Y., 23; 12 Mich., 241; 13 Wis., 644, 15 Barb., 562; 7 Ala., 690; 11 Wen., 240.

Solvency, what is: Bump. Fraud. Conv., 372.

Fraudulent procurement of goods, proper remedy: 45 *Ga.*, 218.

HALL, Justice.

1. The most material questions, as respect the legal sufficiency of the assignment in this record, are identical with those made in *Turnipseed et al. vs. Schaefer et al.*, and to that extent are controlled by the decision therein rendered. Here, as there, valuable assets, belonging to this alleged insolvent corporation, were left out of the schedule required to be annexed under the act of 1881 to the deed or instrument of assignment at the time it was executed, and here, as there, this deed contained a general clause, conveying to the assignee all property of the assignor, which for any cause was omitted from the schedule.

2. Notwithstanding, there are many cases to that effect, we cannot agree with counsel for the complainants, who argued the case with such learning and signal ability, that an insolvent corporation is incapable of making a general assignment for the benefit of creditors, either with or without provisions giving preferences and priority of payment to certain named creditors. The cases relied on go upon general principles of the mercantile and commercial

law, and in the absence of statutory provisions like those contained in the act of 1881, under which this assignment is claimed to have been made, may possibly be correct, although there are others to the contrary, and especially the case of *McCallie & Jones vs. Walton et al., assignees*, 37 *Ga.*, 613, in which Harris, J., broadly says, " In Georgia no statute prevents an assignment by an existing corporation." The above cited act of our legislature in express terms gives the right by name to such corporations, and provides by whom and in what manner the schedules annexed to the assignment are to be sworn to. The briefs of counsel for both sides will furnish the authorities upon the point.

3. Another question made and argued with much ability and force by the learned and indefatigable counsel for the repondents is, that the complainants, who are creditors without any lien, have no right to invoke the remedial aid of a court of equity until their claims are reduced to judgment; and that such was generally the rule at the time this conveyance was executed is undeniably true; but that special circumstances may exist rendering the rule inapplicable is equally true, and we find that some of those circumstances do exist in this case: such, for instance, as the insolvency of the debtor, who, it is alleged, has fraudulently transferred his property to one who is in complicity with him in the fraud, and who is rapidly disposing of the property, or where the property is obtained by fraudulent representations with which the assignee is connected. *Cohen vs. Meyers, Cohen & Co. et al.*, 42 *Ga.*, 46; *Cohen & Co. et al. vs. Morris & Co. et al.*, 70 *Ga.*, 313. And when to these circumstances is added the further fact that large supplies of goods were obtained with a view of making the very assignment in question, to enable the assignee to carry on the business of the party making the assignment for an indefinite period of time, and that these goods are embraced not only in the deed of assignment, but likewise in mortgages cotemporaneously executed to certain

of the creditors preferred by the conveyance, including the assignee himself, to aid, as charged, any defects existing therein which might render it void, and thus prevent the accomplishment of the scheme entered into by the parties, we think a strong case is made for the interposition of equity by an injunction and the appointment of a receiver, whether the complainants' had reduced their demands to judgment or not. The fact of provision being made to carry on the business, by the aid of goods procured for that purpose, and which have not been paid for, raises a presumption, though, perhaps, not a conclusive one, of an intention on the part of the parties to the transaction to delay, hinder and defraud such creditors as are not favored and preferred by the deed. This looks like an arrangement to coerce them to a disadvantageous settlement and compel them to submit to such terms as their debtors may see proper to dictate. In support of these positions. see authorities cited in brief of counsel.

But of what avail would it be to declare the assignment void, as we have done, for its want of conformity to law, if the parties holding these mortgages were allowed to proceed to foreclose them at law, although it might turn out, upon a full hearing of the case, that they were made in aid of this void assignment and with a view to hinder and delay the creditors of the assignor and mortgagors? The complainants are not parties to these mortgages, and would have no right to intervene to prevent their foreclosure and enforcement at law. Code, §3965, and citations. So they would, in that event, be without any remedy to redress their wrongs and enforce their rights unless a court of equity should open its doors and invite them to enter. The issues formed by the facts, as they are presented at this preliminary hearing, must be submitted for determination by the court on the final trial; and as the assignment has been declared void, and the property in dispute is to be preserved until it can be finally disposed of by a full decree, settling the rights and priorities of the parties as

they existed at the time of exhibiting this bill, an injunction must issue and a receiver be appointed as prayed, or upon such other conditions as may appear to be equitable and proper under the law.

Judgment reversed.